**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAROLD J. STENSON,
        *Petitioner-Appellant,*

v.

JOHN LAMBERT,
        *Respondent-Appellee.*

No. 05-99011

D.C. No.
CV-01-00252-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
September 14, 2006—Seattle, Washington

Filed September 24, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Andrew J. Kleinfeld and Carlos T. Bea, Circuit Judges.

Opinion by Chief Judge Schroeder

13017

## COUNSEL

Robert H. Bombiner, AFPD, Seattle, Washington, for the petitioner-appellant.

Sheryl Gordon McCloud, Law Offices of Sheryl Gordon McCloud, Seattle, Washington, for the petitioner-appellant.

Rob McKenna, Attorney General of the State of Washington, John J. Samson, Assistant Attorney General, Criminal Justice Division, Olympia, Washington, for the respondent-appellee.

## OPINION

SCHROEDER, Chief Circuit Judge:

Darold Stenson was convicted and sentenced to death in Washington State in 1994 for the 1993 first-degree murders of his wife, Denise Stenson, and his business partner, Frank Hoerner. The trial was punctuated by disagreements between Stenson and his appointed counsel, Fred Leatherman. Leatherman believed that the trial phase was not winnable and, therefore, thought he should focus on the penalty phase, to spare Stenson from the death penalty. Stenson believed Leatherman should focus on an acquittal. The most serious specific issue during the guilt phase was whether, during cross-examination of Frank Hoerner's wife (also named Denise), Leatherman should attempt to suggest that she, not Stenson, committed the murders. Relatedly, Stenson believed Leatherman should introduce "other suspect" evidence to implicate Denise Hoerner. Leatherman refused to take this approach, because the evidence suggesting that Denise Hoerner had committed the murders was virtually non-existent. The most serious penalty-phase issue was whether Leatherman was ineffective for conceding Stenson's guilt after the jury had decided the issue in the guilt phase, in order to persuade the

jury not to impose the death penalty. *State v. Stenson*, 940 P.2d 1230, 1274-75 (Wash. 1997), *cert. denied*, 523 U.S. 1008 (1998).

Because of the disagreements during trial, Stenson moved for appointment of new counsel or, in the alternative, to represent himself, pursuant to *Faretta v. California*, 422 U.S. 806 (1975). The trial court held a hearing on the motion. It denied Stenson's request for substitution of counsel and found that his request to represent himself was untimely and equivocal. The Washington Supreme Court agreed that Stenson's *Faretta* request was equivocal, and did not reach the issue of timeliness.

Stenson also asked the trial court to appoint independent counsel to represent him at the hearing on his motion to appoint new counsel, raising an issue as to whether the hearing constituted a critical stage of the proceedings. The Washington Supreme Court found that while the hearing constituted a critical stage of the proceedings, independent counsel was not required because Leatherman's second-chair David Neupert, adequately represented Stenson's interests.

In addition to challenging Leatherman's concession of guilt during the penalty phase, Stenson challenged the trial court's refusal to allow testimony from his father and sister regarding the impact his execution would have on his three young children, claiming the exclusion violated *Lockett v. Ohio*, 438 U.S. 586 (1978). As to Leatherman's concession of Stenson's guilt, the Washington Supreme Court ruled the decision was tactical and not deficient under *Strickland v. Washington*, 466 U.S. 668 (1984). It further held that even if the decision had amounted to a deficiency, under *Strickland*'s second prong Stenson could not show that he suffered any prejudice as a result of Leatherman's conduct. As to the *Lockett* claim, the Washington Supreme Court reasoned that Stenson's right to present mitigating evidence had not been violated because the trial court allowed all character and background evidence,

including evidence of Stenson's relationships with his friends and family. It had excluded only direct statements of how Stenson's execution might impact his family members. This evidence, said the trial court, amounted to "nothing more than their opinions as to the sentence" Stenson should receive. *Stenson*, 940 P.2d at 1282.

We have no basis to disagree with the Washington Supreme Court's rulings on Stenson's various claims. We accordingly affirm the judgment of the district court denying Stenson's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## *FACTUAL BACKGROUND*

On March 25, 1993, at 4:00 a.m. Stenson called 911 and told the operator "this is D.J. Stenson at Dakota Farms . . . . Frank has just shot my wife, and himself, I think." Dakota Farms was located in Clallam County, Washington and was the residence of Stenson, his wife, Denise Stenson, and their three young children. Stenson also operated a business, raising and selling exotic birds, from Dakota Farms.

Within several minutes of Stenson's 911 call, the police arrived at Dakota Farms. Stenson met them outside and led them to a guest bedroom on the ground floor, where Frank Hoerner lay dead on the floor with a bullet wound to the head. The body was face-down. A revolver lay between Hoerner's left hand and his head. Stenson next led the police officers to an upstairs bedroom where Denise Stenson lay in the bed, with a severe bullet wound to the head. She was airlifted to a hospital, but died the next day.

Stenson told the officers the following story: Frank Hoerner had arrived at his house a little after 3:30 a.m. in order to sign forms to insure ostriches that Stenson was going to buy for Hoerner on a trip to Texas. When Hoerner arrived, the two men went to Stenson's office in a separate building behind the

house, where Hoerner signed the insurance forms. Hoerner then left the office building to use the bathroom in the house. When Hoerner failed to return, Stenson went to look for him and found him dead in the guest bedroom, where Stenson had shown police the body. Stenson heard moaning from upstairs. When he went upstairs, he found his wife shot in the head. Stenson had not heard any gun shots. Stenson then called the 911 operator. When the officers asked Stenson if he knew why someone would want to kill Frank Hoerner, Stenson responded that there had been sexual problems between Hoerner and his wife, Denise Hoerner, and that Frank Hoerner had complained about their marriage.

The subsequent investigation showed that Frank Hoerner had not committed suicide in the bedroom, but had been hit in the head and dragged into the house from the gravel driveway, through the laundry room, and into the guest bedroom where Stenson claimed to have found the body. Hoerner had been shot in the head in the guest bedroom at close range. The revolver had been placed near Hoerner's hand after his hand had come to rest on the floor.

Splatters of Hoerner's blood were found in the driveway. Blood splatters were also found on Stenson's pants that matched Hoerner's blood protein profile. Gravel from the driveway was found in the laundry room and inside Hoerner's pants. A bloody Stenson fingerprint was found on the freezer in the laundry room. According to Michael Grubb, a forensic expert, the pattern of some of the splatters indicated that they could not have been deposited on Stenson's pants after Frank had been moved, *i.e.*, the splatters on Stenson's pants strongly suggested that Stenson had moved Frank's body after he was shot.

The police also found ammunition in Stenson's garage that fit the murder weapon. They found gunshot residue inside a pocket of Stenson's pants. Stenson had once been a martial arts instructor, and had a collection of nun-chucka sticks on

the wall of his office. Dr. Brady, who performed the autopsy on Frank Hoerner, testified at the trial that the wounds on Hoerner's head were consistent with such a weapon.

The investigation also revealed that Stenson was in financial difficulty. Frank Hoerner had given Stenson a $50,000 deposit for the purchase of exotic birds, but at the time of the murders Stenson's financial records showed that he had used less than $2,000 of Hoerner's deposit to purchase birds. In addition, the bank account for Dakota Farms contained only about $3,400, and an audit indicated that Stenson had used investors' money for personal purchases. He had attempted to borrow a large amount of money shortly before the murders. Finally, Stenson had taken out a $400,000 life insurance policy on his wife.

Stenson was arrested on April 8, 1993, about two weeks after the murders. His jury trial took place in Clallam County, Washington, in the summer of 1994. The prosecution's theory was that Stenson had killed his wife in order to collect the $400,000 in life insurance money, and had killed Frank Hoerner in order to free himself from the $48,000 he owed Hoerner and to be able to blame Hoerner for the murder of Denise Stenson. The prosecutor argued to the jury that the physical evidence taken at the crime scene made Stenson's initial statements to the police implausible.

Frank Hoerner's wife, Denise Hoerner, testified that Stenson solicited Hoerner for investments in Stenson's exotic bird business. Since 1992, Hoerner had given Stenson more than $50,000 for the purchase of birds. About a month before the murders, Hoerner became worried about the money he had entrusted to Stenson and so told Stenson either to return his investment or to deliver the promised birds. In response, Stenson told the Hoerners that he needed to keep their money in his account in order to maintain the confidence of Asian investors from whom he was attempting to obtain a loan. Denise Hoerner further testified that her husband's anxiety

continued when Stenson traveled to Texas to obtain birds for the Hoerners, but returned empty-handed. She testified that Stenson assured Hoerner that he would return to Texas on March 25, 1993, to collect the birds. On the evening of March 24, Stenson told Hoerner to come to his house to sign documents necessary to insure the birds during their trip from Texas. Denise Hoerner offered to come sign the papers, but Stenson said that only Hoerner could sign them. Hoerner agreed to come by Stenson's house during the early morning hours of March 25, on his way to the ferry that he took to work in Seattle.

During the course of the trial, Stenson and his attorney, Fred Leatherman, developed conflicting views as to whether Leatherman should attempt to convince the jury that Denise Hoerner was the murderer. Leatherman did not want to attempt this defense because the forensic expert had concluded that Stenson could not have gotten the blood splatters on his pants after discovering Frank Hoerner's body. In the context of the other evidence, this conclusion strongly suggested that Stenson had moved Hoerner's body after Hoerner had been killed, which in turn strongly suggested that Stenson killed Hoerner. Leatherman believed that attempting to vilify Denise Hoerner would only turn the jury against Stenson and increase the likelihood that it would impose the death penalty during the sentencing phase.

As a result of the conflict regarding trial strategy, Stenson moved the court to appoint new counsel or, in the alternative, to allow him to represent himself. Because Stenson's request came three weeks into the voir dire process and near the end of jury selection, the trial court determined that Stenson's request to represent himself was untimely. It also found that Stenson's request was equivocal, based on the record as a whole. The court based this determination on the fact that Stenson indicated that he "really [did] not want to proceed without counsel[,]" and made his request to represent himself only as an alternative, should the trial court refuse to appoint

new counsel. *Stenson*, 940 P.2d at 1275. The trial court did not appoint independent counsel to represent Stenson at the hearing on the motion for new counsel.

On August 11, 1994, the jury convicted Stenson of two counts of aggravated first-degree murder. With regard to the murder of Denise Stenson, the jury found the aggravating circumstances that more than one person was murdered and that the murders were part of a common scheme or plan. With regard to the murder of Frank Hoerner, the jury found the aggravating circumstances that the murder was committed to conceal a crime or to protect or conceal the defendant's identity, and that more than one person was murdered as part of a common scheme or plan.

During the penalty phase, Leatherman stated that both he and Stenson "accepted" the jury's determination of guilt. Leatherman also requested that the court hear testimony from Stenson's family members regarding the impact Stenson's execution would have on Stenson's three young children and his father, who suffered from a heart condition. The court permitted extensive testimony from Stenson's family and friends regarding their relationships with him, but excluded testimony from Stenson's family members regarding how his execution would impact them, because the court found that this testimony would do no more than present their opinions as to what Stenson's sentence should be. The jury sentenced Stenson to death.

### *PROCEDURAL BACKGROUND*

Stenson appealed his conviction and sentence to the Washington Supreme Court, contending, *inter alia*, that his self representation rights pursuant to *Faretta*, 422 U.S. 806, and his right to have mitigating evidence considered by the jury at the penalty phase under *Lockett*, 438 U.S. 586, had been violated. The Washington Supreme Court affirmed the conviction and sentence. *See Stenson*, 940 P.2d 1239.

In April 1999, Stenson filed the first of three personal restraint petitions with the Washington Supreme Court. In it, he raised, among other issues, his claims of ineffective assistance of counsel, the denial of counsel during a critical stage of the proceedings (*i.e.*, at the hearing on his motion for substitution of counsel), and his conflict with his trial counsel. The Washington Supreme Court denied that petition in 2001. *See In re Stenson*, 16 P.3d 1 (Wash. 2001).

The other two personal restraint petitions were filed during the pendency of Stenson's federal habeas petition, and both were dismissed under state procedural bars, as untimely and as an abuse of the writ, respectively. These claims are not before us.

This proceeding was initiated on February 20, 2001, when Stenson filed his petition pursuant to 28 U.S.C. § 2254, in the Western District of Washington. The district court, in a lengthy and thoughtful decision, denied Stenson's petition and later denied Stenson's petition for reconsideration, which were both founded primarily on the contention that his counsel was ineffective for conceding guilt in the penalty phase in order to try to avoid the death penalty. The district court observed:

> Conceding guilt in the guilt phase is markedly different from conceding guilt in the penalty phase of a capital case after the jury has just found the defendant guilty. The reality that the defendant's counsel faces in the sentencing phase of a capital case once the jury has found the defendant guilty changes the landscape of what constitutes reasonable or deficient performance. As the Supreme Court recognized in *Florida v. Nixon*, [543 U.S. 175 (2004)] "[a]ttorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear." [543 U.S. at 177.]

The district court granted Stenson's motion for a certificate of appealability on a number of issues, including his *Faretta* and *Lockett* claims, his claim that his right to counsel at a critical stage in the proceeding was violated, and his claim that he was denied effective assistance of counsel at sentencing.

## *ANALYSIS*

I. *The Standards Governing This Appeal.*

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), enacted in 1996, "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor*, 529 U.S. 362, 399 (2000). AEDPA prohibits relief on any claim adjudicated in state court unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established federal law," or "was based on an unreasonable determination of the facts[.]" 28 U.S.C. § 2254(d)(1), (2).

A state court decision is contrary to clearly established federal law where the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law." *Williams*, 529 U.S. at 405. A state court decision also is contrary to clearly established federal law "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" the Supreme Court's. *Id.*

A state court decision constitutes an unreasonable application of Supreme Court precedent only if the state court decision is objectively unreasonable. That is, the state court decision must be "more than incorrect or erroneous." *Cooks v. Newland*, 395 F.3d 1077, 1080 (9th Cir. 2005). Whether a state court's application of a rule is reasonable depends on the specificity of the rule. *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004). Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not

addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law. *Kane v. Espitia*, 546 U.S. 9, 9 (2006). Accordingly, Stenson is not entitled to habeas relief under 28 U.S.C. § 2254(d)(1) unless the Washington court's decision "was contrary to or involved an unreasonable application of [the Supreme Court's] applicable holdings." *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006).

We also may grant relief if the state court adjudication "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). AEDPA directs us to presume that state court factual findings are correct. 28 U.S.C. § 2254(e)(1). We may not overturn them "absent clear and convincing evidence" that they are "objectively unreasonable[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

II. *The Washington Supreme Court's Holding That The Trial Court Did Not Violate* Faretta v. California *Was Not Objectively Unreasonable*.

Under the Sixth Amendment, criminal defendants have a right to be represented by an attorney. U.S. Const. amend. VI. The right to counsel has been interpreted to encompass "an independent constitutional right" of the accused to represent himself at trial, and thus waive the right to counsel. *Faretta*, 422 U.S. at 806. Such waiver, however, must be "knowing, voluntary, and intelligent[.]" *Iowa v. Tovar*, 541 U.S. 77, 88 (2004) (citing *Faretta*, 422 U.S. at 806); *Faretta*, 422 U.S. at 835 ("the accused must knowingly and intelligently forgo" the right to counsel) (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)) (internal quotation marks omitted). We also have held that *Faretta* requires a defendant's request for self-representation be unequivocal, timely, and not for purposes of delay. *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004); *see also United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994).

Voir dire began in June. As voir dire was concluding, just before the jury was impaneled, Stenson requested that the trial court appoint new counsel. He made three such requests—one on July 12, one on July 13, and one on July 14, 1994. Each time, the court denied the request and Stenson then asked the court to allow him to represent himself. The trial court determined that, because Stenson's request to represent himself first came on the 20th day of voir dire and on the verge of jury impanelment, it was not timely. In addition, the trial court found that Stenson's request was equivocal, because Stenson plainly did not want to represent himself. He told the court that he was moving to represent himself only because the court had denied his request for substitution of counsel. On July 14, when Stenson again asked the court to allow him to represent himself, he described it as a formal request and stated, "I do not want to do this but the court and the counsel that I currently have force me to do this." The trial court denied the motion. The Washington Supreme Court upheld the trial court's determination, finding that "almost all of the conversation between the trial judge and the Defendant concerned [Stenson's] wish for different counsel. . . . He told the trial court he did not want to represent himself[.]" *Stenson*, 940 P.2d at 1276.

### A. The Washington Supreme Court's Determination That Stenson's *Faretta* Request Was Equivocal Was Not Objectively Unreasonable.

Stenson argues on appeal that the Washington Supreme Court unreasonably applied *Faretta* in finding that his reluctance to proceed pro se did not amount to an unequivocal request to represent himself. The district court, relying on *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994), treated as an issue of fact the question whether Stenson's request to proceed pro se was equivocal. *See also United States v. Mackovich*, 209 F.3d 1227, 1237 (8th Cir. 2000) (stating that the question is a question of fact); *Fields v. Murray*, 49 F.3d 1024, 1032 (4th Cir. 1995) (same).

In its denial of Stenson's federal habeas petition, the district court noted that we look to three factors to determine whether a request for self-representation is unequivocal: the timing of the request, the manner in which the request was made, and whether the defendant repeatedly made the request. In applying these factors, federal courts must give significant deference to the trial court's factual findings. *See* 28 U.S.C. § 2254(e)(1) (state court factual findings "shall be presumed to be correct").

We hold that the Washington Supreme Court's holding that Stenson's request at trial was "not unequivocal," *Stenson*, 940 P.2d at 1275, was not "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). A clear preference for receiving new counsel over representing oneself does not conclusively render a request equivocal under *Faretta*. *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir. 1989). It may, however, be an indication that the request, in light of the record as whole, is equivocal. *United States v. Kienenberger*, 13 F.3d 1354, 1546 (9th Cir. 1994) (denying request for self-representation based on defendant's indication that he wanted "advisory" counsel). Here, the trial court determined that Stenson's request was not unequivocal on the basis of the record as a whole, which included several statements by Stenson that he really did not want to represent himself but that he felt the court and his existing counsel were forcing him to do so. When the court indicated that it did not think Stenson wanted to proceed without counsel, Stenson replied, "[b]ut likewise I do not proceed [sic] with counsel that I have."

**[1]** The Washington Supreme Court relied on several indicators in determining that Stenson's request to proceed pro se was not unequivocal. It cited Stenson's statement that he really did not want to represent himself and noted that he did not refute the trial judge when the judge also came to this conclusion. It cited steps Stenson took to locate another attorney. Finally, it pointed out that Stenson did not include a request to represent himself in his final written request for new coun-

sel and, in fact, he requested that David Neupert, Leather-man's co-counsel, be retained as counsel, supporting an inference that Stenson preferred working with Neupert over representing himself. *Stenson*, 940 P.2d at 1275.

Stenson asks us to rely on *United States v. Hernandez*, 203 F.3d 614 (9th Cir. 2000), and *Adams v. Carroll*, 875 F.2d 1441 (9th Cir. 1989), to find that his request was unequivocal. But Stenson's burden under 28 U.S.C. § 2254(d)(2) is to demonstrate that the Washington court's finding that his request was equivocal "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." He does not do so, and the cases he cites are not analogous.

In *Adams*, the defendant requested appointment of a new attorney early and often, and wound up with the same attorney against whom he had filed a malpractice claim. 875 F.2d at 1442-43. Although the trial court denied Adams' request that it appoint a new attorney, it did allow him to represent himself. *Id.* at 1442. After representing himself for six weeks, Adams requested that the court appoint co-counsel to assist him. *Id.* The court refused to do so. *Id.* Two months after the denial of his request for co-counsel, Adams informed the court that he had filed a malpractice suit against his former attorney and again requested that the court appoint another attorney. *Id.* Adams' request included the condition that the court inform the public defender's office not appoint the attorney against whom Adams had filed the claim, Mr. Carroll, who was a public defender. *Id.*

The public defender service "promptly reassigned Carroll to the case." *Id.* at 1443. Adams thus asked to represent himself once again, but the court denied his motion. *Id.* Adams was forced to proceed to trial with Carroll as his advocate and was convicted on all counts against him. *Id.* Following the trial, Adams filed his federal habeas petition, and initiated his appeal, pro se. *Id.* On appeal, he contended that the trial

court's denial of his last request to represent himself was constitutional error. *Id.* We held that it was error because, although conditioned on the court's refusal to appoint an attorney other than Carroll, Adams' position throughout a several-year period was unwavering. *Id.* at 1445 ("Adams . . . took one position and stuck to it.") The extent of the conflict and the persistence of the defendant in *Adams* are not present in Stenson's case. Unlike Adams, Stenson failed consistently to maintain his desire to represent himself.

In *Hernandez*, the defendant made his initial request to represent himself very early—at the pretrial status conference. 203 F.3d at 617. Stenson did not make his initial request until the day before voir dire ended. Hernandez's request was conditioned on the court's refusal to appoint new counsel. *Id.* Although Stenson's request also was presented as an alternative to appointment of new counsel, it was not similar to Hernandez's. We described Hernandez's request to be "an explicit choice between exercising the right to counsel and the right to self-representation," allowing the court to be reasonably certain that Hernandez wished to represent himself. *Id.* at 621 (citing *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994)) (internal quotation marks omitted). Furthermore, the trial judge in Hernandez engaged in "a dialogue with Hernandez to determine whether [his request] was voluntary and intelligent," and we held that that tended to show the trial court that the request was unequivocal. *Id.*

**[2]** By contrast, all of Stenson's requests for self-representation were concessions that he really did not want to represent himself, but that he felt the court and Leatherman were forcing him to do so. We thus hold that the Washington Supreme Court's interpretation of Stenson's statements as evidencing uncertainty or equivocation regarding his desire to proceed pro se was not objectively unreasonable. Its finding that Stenson's "conditional" request was "an indication to the court, in light of the record as a whole, that the request was not unequivocal," *Stenson*, 940 P.2d at 1276, was not based

on an unreasonable determination of the facts. *Musladin*, 127 S. Ct. at 653.

## B.  The Trial Court's Determination That Stenson's *Faretta* Request Was Untimely Was Not Objectively Unreasonable.

Stenson also argues that the trial court erred in finding that his request to represent himself was untimely. The Washington Supreme Court did not reach the issue of timeliness. We thus look to the trial court's decision as the last reasoned state court decision on the issue. *See Hirschfield v. Payne*, 420 F.3d 922, 928 (9th Cir. 2005).

[3] We are required to determine whether the state court's application of *Faretta* "was contrary to or involved an unreasonable application of [the Supreme Court's] applicable holdings." *Musladin*, 127 S. Ct. at 653. *Faretta* does not articulate a specific time frame pursuant to which a claim for self-representation qualifies as timely. It indicates only that a motion for self-representation made "weeks before trial" is timely. *Faretta*, 422 U.S. at 835. We have found that a state court's denial of a motion made on the morning trial began as untimely was neither contrary to nor an unreasonable application of clearly established federal law. *See Marshall v. Taylor*, 395 F.3d 1058, 1061 (9th Cir. 2005). The Supreme Court has never held that *Faretta*'s "weeks before trial" standard requires courts to grant requests for self-representation coming on the eve of trial. The trial court's determination that Stenson's request to proceed pro se was untimely is not objectively unreasonable under AEDPA.

III.  *The Washington Supreme Court Properly Denied Stenson's Claim Of Ineffective Assistance Of Counsel During Trial.*

Stenson raises three issues with regard to Leatherman's performance at trial. First, he claims that his disagreements

with Leatherman amounted to a conflict of interest effectively denying him representation, in violation of the Sixth Amendment. Second, he claims that the trial court was required to appoint independent counsel during a hearing on his motion to substitute counsel and that the court's failure to do so resulted in denial of counsel during a critical stage of the proceedings. Third, he claims that Leatherman was ineffective for failing to pursue Stenson's suggested trial strategy—to attempt to convince the jury that Denise Hoerner, and not Stenson, committed the murders.

Stenson premises his conflict and ineffective assistance claims on Leatherman's refusal to adopt his suggested strategy of attempting to pin the crimes on Denise Hoerner. Stenson believed Leatherman should attempt to introduce a statement Denise Hoerner once made indicating that she had motive and opportunity to kill her husband, specifically, that she wished her husband were dead because she would not be able to get any money under the prenuptial agreement unless he died. Leatherman did not attempt to introduce this statement because, under Washington law, "other suspect" evidence requires a "train of facts or circumstances which tend clearly to point to someone other than the defendant as the guilty party." *In re Lord*, 868 P.2d 835, 849 (Wash. 1994). Leatherman was convinced that Mrs. Hoerner's statement did not meet Washington's evidentiary standard for admission.

Leatherman also believed that attempting to implicate Mrs. Hoerner, in the face of overwhelming evidence against Stenson, would turn the jury against Stenson and drastically reduce his chance for a sentence of life instead of death in the penalty phase. Stenson claims that Leatherman's refusal to attempt to pin the crimes on Mrs. Hoerner amounted to a conflict of interest, an irreconcilable conflict, and a constructive denial of counsel because Leatherman had a different trial objective than Stenson, that is, he did not want to "win" the trial; he merely wanted to avoid the death penalty.

The Sixth Amendment guarantees criminal defendants the right to representation at all critical stages of the proceedings. *Coleman v. Alabama*, 399 U.S. 1, 3 (1970). This right encompasses the right to conflict-free representation. *See Wheat v. United States*, 486 U.S. 153, 153 (1988). The Washington Supreme Court and the district court construed Stenson's conflict argument as both a contention that Stenson and Leatherman had an "actual" conflict of interest, under the Sixth Amendment's guarantee of a right to conflict-free assistance of counsel, *Wheat*, 486 U.S. at 153, and an assertion of an "irreconcilable" conflict amounting to the constructive deprivation of counsel, *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) *cited in Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000).

## A. The Washington Supreme Court's Determination That Stenson And Leatherman Did Not Have An Actual Conflict of Interest Was Not Contrary To Or An Unreasonable Application Of Federal Law.

**[4]** Although a criminal defendant enjoys the right to conflict-free representation, the mere "possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan*, 445 U.S. 335, 350 (1980). In order to demonstrate an actual conflict of interest, the defendant must show that his attorney was actively representing conflicting interests and that the conflict adversely affected the attorney's performance. *Id.* at 348-50.

**[5]** The Washington Supreme Court noted that the phrase "conflict of interest" is a term of art in the law. 16 P.3d at 8. Ordinarily, it denotes representation of multiple conflicting interests, such as an attorney's representation of more than one defendant in the same criminal case, or representation of a defendant where the attorney is being prosecuted for related crimes. *See Mickens v. Taylor*, 535 U.S. 162, 176 (2002) ("until . . . a defendant shows that his counsel *actively represented* conflicting interests, he has not established the consti-

tution predicate for his claim of ineffective assistance") (quoting *Sullivan*, 446 U.S. at 350) (emphasis in original); *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998) (distinguishing a conflict of interest, which is "the existence of competing interest potentially affecting counsel's capacity to give undivided loyalty to his client's interests," from an irreconcilable conflict). Stenson's disagreement with Leatherman is better characterized as one over trial strategy, and the Washington Supreme Court so characterized it. We can find no clearly established Supreme Court precedent holding that this kind of disagreement amounts to an actual conflict of interest. The Washington Supreme Court correctly determined that no clearly established federal law supports Stenson's construction of "conflict of interest" as describing a disagreement between attorney and client over trial strategy.

### B.  The Washington Supreme Court's Determination Of No Irreconcilable Conflict Was Not Contrary To Or An Unreasonable Application Of Federal Law.

[6] The Sixth Amendment does not guarantee a "meaningful relationship" between a client and his attorney. *Morris v. Slappy*, 461 U.S. 1, 14 (1983). However, forcing a defendant to go to trial with an attorney with whom he has an irreconcilable conflict amounts to constructive denial of the Sixth Amendment right to counsel. *Brown*, 424 F.2d at 1170. An irreconcilable conflict in violation of the Sixth Amendment occurs only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel. *Schell*, 281 F.3d at 1026. Disagreements over strategical or tactical decisions do not rise to level of a complete breakdown in communication. *Id.*

To determine whether a conflict rises to the level of "irreconcilable," a court looks to three factors: 1) the extent of the conflict; 2) the adequacy of the inquiry by the trial court; and 3) the timeliness of the motion for substitution of counsel.

*Moore*, 159 F.3d at 1158-59. A trial court's inquiry regarding counsel's performance on a motion to substitute counsel should be "such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern." *United States v. Garcia*, 924 F.2d 925, 926 (9th Cir. 1991) (internal quotation marks and citation omitted). It also should provide a "sufficient basis for reaching an informed decision[ ]" regarding whether to appoint new counsel. *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986).

**[7]** Stenson now argues that the Washington Supreme Court's ruling on the extent of the conflict and the adequacy of the trial court's inquiry was objectively unreasonable and factually unsupported. He also contends that the trial court's reliance on Leatherman's competence was improper. We do not agree. In assessing the extent of the conflict, the trial court held numerous ex parte hearings with Stenson and Leatherman to determine whether communication had broken down and whether substitute counsel was warranted. In the course of these hearings, the trial court vetted Leatherman's reasons for adopting the trial strategy he had adopted. It satisfied itself as to Leatherman's competence. It also examined the flow of communication between Stenson and David Neupert, Leatherman's second-chair and determined that communication between Neupert and Stenson remained open, as did the lines of communication between Neupert and Leatherman. Thus, because Neupert was in constant communication with Leatherman and because Stenson could and did communicate with Neupert, the trial court found that there was no breakdown of communication between Leatherman and Stenson so severe as to amount to constructive denial of counsel.

The Washington Supreme Court, in rejecting Stenson's final personal restraint petition, focused on Leatherman's competence. It noted that Leatherman had cross-examined twenty-five of the state's thirty-three witnesses, called five witnesses of its own, and that Stenson had "expressed general satisfaction with the way his attorneys conducted the trial." *In*

*re Stenson*, 16 P.3d at 8. It thus upheld the trial court's determination.

**[8]** Although we have held that a complete breakdown of communication may occur even where counsel is providing competent representation, we have done so only in extreme cases. *See United States v. Nguyen*, 262 F.3d 998, 1003 (9th Cir. 2001); *United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000). In *Nguyen*, the trial judge, who was sitting by designation in Guam and expressed concern regarding traveling "halfway around the world" to hear the case, "improperly emphasized his own schedule at the expense of Nguyen's Sixth Amendment rights." 262 F.3d at 1003. Furthermore, the trial court's inquiry there focused "exclusively on the attorney's competence and refused to consider the relationship between Nguyen and his attorney." *Id.* The court's refusal to consider the relationship was significant in *Nguyen* because, by the time trial began, Nguyen was "left to fend for himself"; he could not confer with his attorney about trial strategy or evidence, or even get his attorney to explain the proceedings. *Id.* at 1004. No communication at all flowed between attorney and client.

By contrast, the Washington Supreme Court here determined that lines of communication between Stenson and Neupert, Leatherman's second-chair, were still active. Thus, on balance, Leatherman's competence was a more significant factor in the Washington Supreme Court's analysis in this case. We have also determined the extent of an alleged conflict by examining the attorney's performance and competence, lending support to the Washington Supreme Court's emphasis on Leatherman's competence in its determination that the trial court's inquiry was sufficient. *See Moore*, 159 F.3d at 1159 (holding that attorney's failure to keep defendant informed of plea negotiations and to prepare for trial because he felt physically threatened by defendant demonstrated irreconcilable conflict); *Frazer v. United States*, 18 F.3d 778, 785 (1994) (holding that refusal to collect useful evidence for mit-

igation in combination with calling defendant derogatory racist names demonstrated irreconcilable conflict).

**[9]** In light of applicable holdings of the Supreme Court and on the basis of the record as a whole, the Washington Supreme Court's determination that there was no irreconcilable conflict was not contrary to or an unreasonable application of federal law. *Musladin*, 127 S. Ct. at 653.

**C. The Washington Supreme Court's Determination That The Trial Court Was Not Required to Appoint Independent Counsel to Represent Stenson At The Hearing On His Motion for a New Attorney Was Not Contrary To Or An Unreasonable Application Of Federal Law.**

**[10]** A criminal defendant is entitled to representation at every critical stage of the proceedings. *Coleman*, 399 U.S. at 3; *Correll v. Ryan*, 465 F.3d 1006, 1009 (9th Cir. 2006). A "critical stage" is any proceeding that implicates "substantial rights of the accused." *Id.* In the context of a motion to substitute counsel, this court has suggested that separate counsel may be warranted, for purposes of the motion, where current counsel fails to assist the defendant in making the motion or takes an adversarial and antagonistic stance regarding the motion. *Adelzo-Gonzalez*, 268 F.3d at 779-80.

In his first personal restraint petition, Stenson argued that the trial court should have appointed independent counsel to represent him at the July 13 hearing on his motion to substitute counsel because Leatherman's antagonistic position left him effectively without representation. The Washington Supreme Court rejected this claim because, as we have seen, the lines of communication between Stenson and David Neupert remained open. Even assuming Leatherman could not be effective, the court found that Neupert was.

**[11]** Stenson relies on *United States v. Wadsworth*, 820 F.2d 1500 (9th Cir. 1987), to argue that the Washington

Supreme Court's holding was in error. *Wadsworth* is not analogous. Critical facts distinguish *Wadsworth* from Stenson's case. In *Wadsworth*, the defendant's appointed counsel admitted that he had stopped preparing for trial and had effectively "quit" working on Wadsworth's case because he was not "receiv[ing] the cooperation" he expected from Wadsworth. *Id.* at 1508. Wadsworth also presented the court with evidence that his attorney had neglected to respond to evidence and, as a result, effectively had waived any defense to the evidence. *Id.* Finally, during the court inquiry regarding the extent of the conflict, Wadsworth's attorney dismissed Wadsworth's concerns as "a bunch of hooey." *Id.* at 1507. We held that, taken together, these facts demonstrated that Wadsworth was denied the effective assistance of counsel because his attorney "had taken an adversary and antagonistic position on a matter concerning his client's right to counsel and to prepare for trial." *Id.* at 1510-11.

**[12]** This case, however, presents no such antagonism. Although Stenson and Leatherman disagreed about Leatherman's approach to the defense, Leatherman never stopped preparing for trial and never let up in his vigorous defense of Stenson. When Stenson requested substitute counsel, the court held a hearing and found that the dispute was over strategy, which did not warrant granting Stenson's request. It further found no impediment to Neupert's ability to advocate for Stenson, either to Leatherman or to the court. The Washington Supreme Court agreed with the trial court and dismissed Stenson's claim. It noted that, whatever Stenson's claims with respect to Leatherman, Neupert had represented Stenson "continuously."

**[13]** The Washington Supreme Court also distinguished *Wadsworth* on similar grounds. Its determination that Leatherman did not engage in egregious conduct amounting to an absolute denial of representation was a reasonable application of Supreme Court precedent. *Musladin*, 127 S. Ct. at 653.

**D. The Washington Supreme Court's Determination That Leatherman Did Not Provide Ineffective Assistance For Refusing To Implicate Denise Hoerner Was Not Contrary To Or An Unreasonable Application Of Federal Law.**

Under the Sixth Amendment, a criminal defendant is entitled to effective assistance of counsel. *See Strickland*, 466 U.S. at 686. To demonstrate ineffective assistance of counsel amounting to a constitutional violation, Stenson must show that Leatherman's performance fell below an objective standard of reasonableness and that, but for Leatherman's deficient performance, the outcome of the trial would have been more favorable for Stenson. *Id.* at 687.

In arguing that Leatherman's representation was ineffective, Stenson points to Leatherman's refusal to attempt to implicate Denise Hoerner by introducing "other suspect" evidence and by cross-examining her in a manner that would suggest she committed the murders. The Washington Supreme Court found that Leatherman's decision not to attempt to implicate Denise Hoerner was a question of trial strategy. It further found that there was nothing in the record other than Stenson's unsubstantiated suspicions that pointed to Denise Hoerner as a suspect. Thus, it concluded that Leatherman had correctly determined during trial that the evidence Stenson wanted him to introduce would not have been admissible under Washington law, because there were no facts in the record to support it. *See In re Lord*, 868 P.2d at 849 (holding that introduction of "other suspect" evidence requires a "train of facts or circumstances which tend clearly to point to someone other than the defendant as the guilty party"). Because the evidence would not have been admissible under state law, the Washington Supreme Court found that Leatherman's decision not to introduce it could not have been defective.

Furthermore, the Washington Supreme Court found that Leatherman had thoroughly investigated the possibility that

Denise Hoerner had committed the murders; he had an investigator stake out her house and look into the possibility that she had a boyfriend. Leatherman also subpoenaed Mrs. Hoerner's bank records. He found no evidence suggesting that Mrs. Hoerner had killed her husband and Denise Stenson.

[14] *Strickland* counsels that attorneys have a "duty to make reasonable investigations" regarding whether admissible evidence exists. 466 U.S. at 691. In evaluating attorneys' judgments as to whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). We apply a "heavy measure of deference to [an attorney's] judgments" as to whether additional evidence may be adduced by further investigation. *Id.* As the district court said, "[i]f the decision not to investigate beyond a certain point is reasonable, then the failure to do so cannot constitute ineffective assistance of counsel."

[15] Here, the Washington Supreme Court determined that Leatherman's decision not to attempt to introduce "other suspect" evidence against Denise Hoerner was reasonable because Leatherman had made a reasonable investigation that failed to turn up potentially admissible evidence. Because the reports of Leatherman's investigation were not in the trial record, Leatherman would not be able to meet the burden of "coming up with enough evidence to clearly point to [Denise Hoerner] as the guilty party," as state law required. *Stenson*, 940 P.2d at 1272; *see also In re Lord*, 868 P.2d at 849. The state court's finding that Leatherman investigated Stenson's theory and tried to come up with some admissible evidence to support it is not an unreasonable determination of the facts. Its determination that Leatherman was not ineffective was a reasonable application of *Strickland*'s directive that attorneys be given a "heavy measure of deference" in their trial choices. Furthermore, Stenson cannot show that, even if Leatherman's performance in refusing to introduce evidence to try to impli-

cate Mrs. Hoerner was deficient, the outcome of the trial would have been more favorable to him.

IV. *Leatherman's Decision To Concede Stenson's Guilt During The Sentencing Phase Of The Trial Was Not Objectively Unreasonable Under Federal Law.*

An attorney's decision to concede guilt in the sentencing phase of a trial is not necessarily an unreasonable tactical decision. *Florida v. Nixon*, 543 U.S. 175, 176-77 (2004). When the evidence against a defendant in a capital case is overwhelming and counsel concedes guilt in an effort to avoid the death penalty, "counsel cannot be deemed ineffective for attempting to impress the jury with his candor[.]" *Id.* at 192.

The Washington Supreme Court did not address whether Leatherman's decision to tell the jury that he and Stenson "accepted" its verdict amount to ineffective assistance of counsel. As a result, we conduct an independent review of the record. *See Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).

At sentencing, Leatherman told the jury, "I [ ] want you to understand that . . . we accept your verdict without reservation whatsoever. We don't question it. We understand that your verdict is supported by the evidence[.]" He then proceeded to introduce mitigating evidence, including the testimony of Stenson's friends and family regarding their relationships with Stenson. Stenson argues that Leatherman's concession of guilt was error amounting to ineffective assistance of counsel because Leatherman should have continued to pursue a theory of residual doubt about Stenson's guilt.

[16] The Supreme Court has held that residual doubt is not a properly mitigating factor. *Oregon v. Guzek*, 546 U.S. 517, 126 S.Ct. 1226, 1230-32 (2006). In addition, as Leatherman seems to have recognized here, arguing residual doubt is inconsistent with a capital defendant's conviction in the guilt phase, because sentencing "traditionally concerns *how*, not

*whether*, a defendant committed the crime." *Id.* at 1230 (emphasis in original). By the time they reach the sentencing phase, the parties already have litigated whether the defendant committed the crime.

**[17]** The Supreme Court also has held that conceding guilt in the penalty phase is permissible. *Nixon*, 547 U.S. at 192. The lawyer in *Nixon* was faced with a "disruptive and violent" client who remained "unresponsive" throughout the trial. *Id.* at 182. Furthermore, the evidence against Nixon was substantial. He had confessed to the crime and "described [it] in graphic detail[.]" *Id.* at 179. The State subsequently "gathered overwhelming evidence establishing that Nixon had committed the murder in the manner he described." *Id.* at 180. His attorney concluded that, "given the strength of the evidence, [ ] Nixon's guilt was not subject to any reasonable dispute." *Id.* (internal quotation marks omitted). The attorney therefore took the tack that his job was to "present extensive mitigating evidence [during sentencing] centering on Nixon's mental instability." *Id.*

**[18]** The Supreme Court held that the attorney's strategy was not unreasonable, given the circumstances. In so holding, it acknowledged that "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Id.* at 187. It said, however, that an attorney is not required "to obtain the defendant's consent to 'every tactical decision.' " *Id.* In cases where the evidence of guilt is overwhelming and the attorney is attempting to avoid the death penalty, an attorney does not need to obtain the defendant's explicit consent before he concedes guilt in the sentencing phase. *Id.* 188-89.

**[19]** Stenson argues that Leatherman's concession of guilt went beyond *Nixon* because Leatherman did not consult with him before conceding that he "accepted" the jury's guilty verdict. But *Nixon* did not hold that an attorney must obtain defendant's consent when conceding guilt in the sentencing

phase. Indeed, even during the guilt phase, an attorney is not required to obtain a defendant's "affirmative, explicit acceptance" of his strategy, so long as the attorney continues to "function in [a] meaningful sense as the Government's adversary." *Id.* at 188, 190. The district court pointed out that the jury might have reacted "positively" to Leatherman's decision to concede guilt in the penalty phase "because it showed that Leatherman and Stenson respected . . . the jury's finding, thereby gaining credibility with the jury." We agree with the district court's assessment. On the record before us, there is no indication that Leatherman's concession of Stenson's guilt is contrary to or an unreasonable application of *Nixon* or *Strickland*.

V. *The Washington Supreme Court's Determination That The Trial Court Did Not Improperly Exclude Mitigating Evidence Was Not Contrary To Or An Unreasonable Application Of Federal Law.*

[20] *Lockett v. Ohio* mandates that courts engage in "individualized consideration of mitigating factors" to ensure that "each defendant in a capital case [is treated] with that degree of respect due the uniqueness of the individual." 438 U.S. at 605. Under this rule, the jury may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604; *see also McCleskey v. Kemp*, 481 U.S. 279, 306 (1987); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).

At the beginning of the penalty phase, Leatherman proposed a jury instruction outlining the factors that could be considered as mitigating circumstances. He requested that the impact of Stenson's execution on his family, particularly on his three young children and his father, who suffered from a heart condition, be included as mitigating circumstances. He indicated that he would ask Stenson's family members

directly what impact they believed Stenson's execution would have on his father and children. The trial court refused to allow the testimony, concluding that it was not relevant to Stenson's character or background. However, the trial court did permit extensive testimony from Stenson's family members and friends about their relationships with Stenson and whether they would continue those relationships while Stenson was in prison.

Stenson argues that the trial court's exclusion of specific testimony as to the impact of his execution violated *Lockett*'s requirement that all mitigating evidence be considered. The Washington Supreme Court rejected this argument, noting that, although a defendant is entitled to introduce any aspect of his character or record, or any aspect of the offense, as a mitigating circumstance, "nothing limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on defendant's character, prior record, or the circumstances of the offense." *Stenson*, 940 P.2d at 1281. It concluded that "execution impact" testimony is not relevant mitigating evidence.

**[21]** The testimony the trial court excluded encompassed a very narrow swath of evidence, revealing only what Stenson's family members' opinions were as to the sentence Stenson should receive. Although mitigating evidence need not relate directly to the offense, the evidence Stenson argues should have been admitted simply does not relate to "any aspect of [his] character or record" that was not addressed by the testimony given. Stenson cannot point to any federal case requiring admission of "execution impact" testimony because there are no such cases. *Lockett* does not stand for that principle. The Washington Supreme Court's determination that the trial court was not required to admit Stenson's proposed "execution impact" testimony is therefore not objectively unreasonable.

## *CONCLUSION*

For the reasons set forth above, the district court's Denial of Stenson's petition for a writ of habeas corpus is AFFIRMED.