**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DOMONIC RONALDO MALONE,

 *Petitioner-Appellee,*

v.

BRIAN WILLIAMS, Warden;
ATTORNEY GENERAL FOR THE
STATE OF NEVADA,

 *Respondents-Appellants*.

No. 22-16671

D.C. No.
2:18-cv-01146-
RFB-NJK

ORDER

Filed August 15, 2024

Before: Johnnie B. Rawlinson and John B. Owens, Circuit
Judges, and Dean D. Pregerson,[*] District Judge.

Order;
Statement by Judge Bybee;
Statement by Judge Pregerson

[*] The Honorable Dean D. Pregerson, United States District Judge for the
Central District of California, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel filed an order denying a petition for rehearing en banc from a memorandum disposition affirming the district court's grant of habeas relief under 28 U.S.C. § 2254 on the ground that the Nevada Supreme Court's determination that Dominic Ronaldo Malone's waiver of the right to self-representation was equivocal was based on an unreasonable determination of the facts.

In a statement respecting the denial of rehearing en banc, Judge Bybee, joined by Judges Gould, Callahan, M. Smith, Ikuta, Owens, Bennett, R. Nelson, Bade, Collins, Bress, Forrest, Bumatay, and VanDyke, wrote that the grant of habeas relief should have been reversed because Malone did not invoke his Sixth Amendment right to self-representation unequivocally. He suggested that the Supreme Court should summarily reverse this case and warned that the lower federal courts and state courts should not rely on the memorandum disposition.

In a statement respecting the denial of rehearing en banc, District Judge Pregerson, joined by Judge Rawlinson, wrote that the Court appropriately declined to rehear this case en banc because the disposition is a non-precedential determination of fact on an issue that was presented solely as a question of fact; and Judge Bybee's statement respecting the denial of rehearing en banc ignores precedent, requests summary reversal on grounds never raised by the parties,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

inaccurately characterizes both the memorandum disposition and the record upon which it is based, and seeks to substitute its own factual determinations for that of the panel majority.

## ORDER

Judge Rawlinson voted to deny, Judge Owens voted to grant, and Judge Pregerson recommended denying, the Petition for Rehearing En Banc. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

Respondents-Appellants Petition for Rehearing En Banc, filed February 21, 2024, is DENIED.

BYBEE, Circuit Judge, with whom GOULD, CALLAHAN, M. SMITH, IKUTA, OWENS, BENNETT, R. NELSON, BADE, COLLINS, BRESS, FORREST, BUMATAY, and VANDYKE, Circuit Judges, join, respecting the denial of rehearing en banc:

I regret the need to issue this statement regarding the denial of rehearing en banc, but this case cries for reversal. I write for two reasons: first, as a suggestion to the U.S. Supreme Court that the case should be summarily reversed; and second, as a warning to lower federal courts and, especially, our colleagues in the state courts not to rely on our deeply flawed memorandum disposition.

Domonic Malone was charged with capital murder and kidnapping in Nevada state court. After the public defender's office was appointed, Malone invoked his *Faretta* right to self-representation. He equivocated repeatedly thereafter. He accused the trial court of "denying [him] the right to have representation," and he stated in no uncertain terms that he "had asked for . . . counsel." These equivocations culminated in a memorandum to the state trial court, in which Malone complained that he had "been forced to represent himself in this case" and that he "ha[d] always been more than willing to accept proper assistance." Malone made clear that he "*did not want to represent himself*" any longer. (Emphasis added.) The state trial court then held a hearing and asked Malone whether he no longer wanted to represent himself. Malone responded, "Yes. Yes, sir." The trial court re-appointed the public defenders. Malone was convicted; although he was facing the death penalty, he was sentenced to life without parole. Malone then appealed on the grounds that he was denied his Sixth Amendment right to self-representation. Citing *Faretta*, the Nevada Supreme Court affirmed. Malone sought federal habeas relief, which the district court granted a decade after Malone's conviction.

This should have been an easy case. A defendant has the right to represent himself, but he must invoke that right unequivocally. *See Faretta v. California*, 422 U.S. 806, 817, 835 (1975). Clearly established federal law requires courts to "indulge in every reasonable presumption against waiver" of the right to counsel. *Brewer v. Williams*, 430 U.S. 387, 404 (1977). Malone *asked for representation—repeatedly—* and accused the state court of denying him the right to counsel. The right outcome could not have been more obvious. But our panel did not apply clearly established federal law as determined by the Supreme Court. It ignored

the *Brewer* presumption, cited *Faretta* once, and then relied almost exclusively on direct-appeal and pre-AEDPA Ninth Circuit cases. The decision violated AEDPA at every turn. It "was not just wrong." *Sexton v. Beaudreaux*, 585 U.S. 961, 967 (2018) (per curiam). "It also committed fundamental errors that th[e Supreme] Court has repeatedly admonished courts to avoid." *Id.* Its saving grace is that it is unpublished, but that will not prevent the confusion it has sown from seeping into state courts. Uneducated and indigent defendants will bear the cost of the panel's repudiation of the presumption in favor of appointed representation. The problem will be particularly acute in Nevada, where, because we have granted the writ in a high-profile case, the state courts will have been instructed with all the wrong answers.

Failing to enforce *Brewer*'s presumption gives criminal defendants a unique finality-busting tool that all but guarantees AEDPA arbitrage. Departing from the unequivocal-invocation requirement places "trial courts in a position to be whipsawed by defendants clever enough to record an equivocal request to proceed without counsel in the expectation of a guaranteed error no matter which way the trial court rules." *Meeks v. Craven*, 482 F.2d 465, 468 (9th Cir. 1973). A defendant will have the federal court end-played either way: "If the court appoints counsel, the defendant could . . . rely on his intermittent requests for self-representation in arguing that he had been denied the right to represent himself; if the court permits self-representation, the defendant could claim he had been denied the right to counsel." *Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989). The panel decision is a get-out-of-jail-free card that flies in the face of AEDPA.

We should have reheard this case en banc.

# I

## A. *Factual Background*

The facts are straightforward.  In Part I.A.1, I describe Malone's frequent requests for counsel following his invocation of *Faretta*.  In Part I.A.2, I point out Malone's unmistakable pattern of delay and disruption during his year-and-a-half period of self-representation.

### 1.  Malone's equivocal statements

Malone was accused of kidnapping and beating two women to death and leaving their naked bodies in the desert. He was charged with capital murder and kidnapping. Nevada sought the death penalty, and in 2006, the trial court appointed two experienced attorneys from the Nevada Special Public Defenders Office ("the SPDO").  Until his conviction in 2012, Malone repeatedly vacillated on whether he wanted to represent himself.  Toward the end of 2009, Malone moved to dismiss his counsel.  The court held a *Faretta* hearing.  Malone explained that his attorneys had not acted on certain leads he had suggested pursuing.  Malone further explained that he felt as though he had "no choice" but to represent himself, because he "tr[ied] many times to get other attorneys," but he "was unsuccessful."  As Malone told it, his "only option" was self-representation.  The state trial court found that Malone had knowingly and voluntarily waived his right to counsel, but it appointed the SPDO as standby counsel.

Malone equivocated two months later.  He stated, "I did would [*sic*] like to have my counsel back."  The court inquired, "Sir, am I hearing you correct that you do not wish to represent yourself now?"  Malone replied, "At this point in time, that's what I was working on, sir."  Given the

ambiguity in Malone's answer, the court asked whether Malone wished to have the SPDO represent him, and Malone replied, "at this point in time no, sir." The court did not reappoint the SPDO.

Several months later, Malone asked the court to dismiss his standby counsel. The court held a hearing on that motion. At that hearing, Malone expressed his disdain that his standby counsel had failed to file certain motions requested by Malone. The court explained that the SPDO was on standby and that, because Malone had invoked his right to self-representation, he should have filed the motions himself. Malone replied, "during my *Faretta* hearing[,] I had asked for . . . counsel and stuff like that." Malone continued, "you denied me the right to have representation." The court declined to remove the SPDO in standby capacity, but the court also declined to reappoint the SPDO to represent Malone. Malone concluded by asking, "So you're telling me today you're denying me the right to have representation?" The court replied, "Sir, you heard [m]y decision. . . . I'm denying your motion."

A few months later, the court held a hearing on Malone's motion for a complete rough draft transcript of his co-defendant's trial. The court pointed out that Malone "didn't put any argument in [his] motion," nor did he "serve it on [the] State." The court noted that it was a "[h]uge mistake" for Malone to represent himself. Malone agreed: "I know, sir. I do agree. I do agree, but what I have to do [*sic*]." The court asked, "You want a lawyer?" Malone replied, "I did. Not the ones I got now." The court did not reappoint the SPDO at this time.

Malone's equivocations did not stop there. Just weeks later, Malone filed a handwritten memorandum with the

court.  In it, Malone reiterated that he had "been forced to represent himself in this case" and that he "ha[d] always been more than willing to accept proper assistance," but he accused the court of "not allow[ing] him to pursue this goal." The court held a hearing on this issue on July 19, 2011. There, the court said to Malone, "Sir, your pleading[] [is] very clear.  The Defendant did not want to represent himself in this matter."  Malone replied, "Yes.  Yes, sir."  The court later gave Malone an opportunity to speak, but Malone did not suggest that he desired to continue representing himself. Malone had represented himself for more than a year and a half.  The court re-appointed the SPDO to represent Malone.

Eight days later, on July 27, 2011, the SPDO requested to withdraw as counsel, stating that "Malone has sent a letter alleging there has been a breakdown in the Attorney/Client relationship."   The court held a hearing on the matter. Malone claimed that the SPDO was attempting to murder him.  The court denied the motion to withdraw as counsel. The judge addressed Malone:  "I think you've been playing games because I gave you the *Faretta* Canvassing."   The court described Malone's frequent flip-flop of positions and stated that it would not "play[] games any more [*sic*]."  The SPDO ultimately represented Malone through the duration of the trial.

2.  Malone's pattern of disruption and delay

After Malone successfully invoked his right to self-representation, he incessantly flouted court rules, filed frivolous motions, and engaged in tactics designed to delay and obstruct the proceedings.  For example, he filed a motion for a paralegal because "all attorney(s) have at least one." After the trial court denied that motion, Malone renewed the motion twice.  Malone also filed a motion to suppress a

witness's statement for "lying," as well as a motion alleging that his standby counsel had not filed motions on his behalf. Some of these motions were, as the State characterized them, "really a bunch of psycho-babble." At several points, Malone failed to follow court procedure. He did not serve certain motions on the State, and he filed other motions without any argument or relevant authorities.

Malone also introduced intentionally contradictory statements to manufacture issues on appeal. For example, Malone often reversed his position on the timing of his trial date. On December 15, 2009, Malone filed a *pro se* motion for a speedy trial. But at the *Faretta* canvass on January 8, 2010, Malone objected to an April 5, 2010, trial date, which had been scheduled since October of the previous year. Malone expressed that the trial date was too soon given his lack of preparation. He reversed course shortly thereafter. At a hearing two months later, standby counsel requested a continuance because of an unforeseen medical procedure. But Malone objected to this continuance, complaining that the trial "keep[s] getting pushed back and pushed back and pushed back."

Malone engaged in other obstructionist tactics. To name but one example, Malone refused to be transported from the jail to attend a hearing. At a hearing about a week later, Malone's explanation was that he "was emotionally distraught" about the pending trial.

All the while, the state trial court consistently reminded Malone that his disruptions and delays could be the basis to revoke his *Faretta* rights. The judge admonished Malone: "I have grounds to . . . revoke your status of representing yourself because I have a basis to do that if you're disruptive to the Court, you don't file a proper Court procedure

[*sic*]. . . . So if you do that again, Mr. Cano or Mr. Pike will be representing you." He also advised Malone: "if you . . . d[o] not follow the rules as you're supposed to[,] that could be grounds for me to no longer allow you to represent yourself."

## B. *State Appeal*

Malone was ultimately convicted of thirteen felony counts, including two counts of first-degree murder with use of a deadly weapon and two counts of first-degree kidnapping. He was acquitted of some other charges, including robbery, pandering, and burglary. Although the jury determined that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances, Malone's lawyers convinced the jury not to impose the death penalty. Malone was sentenced to life in prison without parole.

He appealed to the Nevada Supreme Court, which affirmed on the merits. *See Malone v. State*, No. 61006, 2013 WL 7155086, at *1–3 (Nev. Dec. 18, 2013) (unpublished). The court rejected Malone's *Faretta* arguments. It reviewed the trial court's decision for abuse of discretion and its factual findings as to equivocality for clear error. *Id.* at *1. The court pointed out that "Malone repeatedly failed to follow procedural rules," and that "[e]ach time Malone appeared in court, the district court repeatedly admonished him about self-representation." *Id.* The court also emphasized Malone's equivocations, noting that "Malone indicated that he wanted counsel appointed." *Id.* The court canvassed Malone's several equivocal statements. Citing *Faretta* and other Supreme Court cases, the Nevada Supreme Court concluded that "the district court's finding that Malone's actions were equivocal and

appeared to be made for the purposes of delay was not clear error." *Id.* at \*2.

## C. *Federal Proceedings*

Malone sought federal habeas relief, which the district court granted in 2022 with respect to the *Faretta* claim. It cited *Faretta* for the general proposition that "[a] criminal defendant has a right under the Sixth and Fourteenth Amendments to represent himself at trial." It identified no other Supreme Court cases that supported relief. Without citing or acknowledging the strong presumption against waiver, the district court cited our 1989 pre-AEDPA decision in *Adams v. Carroll* as "applicable and controlling." It then relied almost exclusively on Ninth Circuit precedent developed on direct appeal to issue the writ, including *United States v. Hernandez*, 203 F.3d 614 (9th Cir. 2000), *overruled by Indiana v. Edwards*, 554 U.S. 164 (2008); *United States v. Allen*, 153 F.3d 1037 (9th Cir. 1998); and *United States v. Robinson*, 913 F.2d 712 (9th Cir. 1990). Its lone citation to a post-AEDPA collateral-review case about *Faretta* followed a "*but see*" signal. The court then concluded that "Malone was not equivocal about his desire to represent himself" and that "the record does not support a finding of a pattern of substantial procedural obfuscation or delay by Malone."

A divided panel of our court affirmed in an unsigned memorandum disposition. The decision cited *Faretta* for the principle that a defendant has the "basic right to defend himself if he truly wants to do so," and then it invoked our own pre-AEDPA and direct-review cases. It cited no other Supreme Court cases about *Faretta*. In fact, it cited only one other Supreme Court case—*Harrington v. Richter*, 562 U.S. 86 (2011)—in a background paragraph about § 2254(d).

Applying legal rules articulated in circuit case law but not *Faretta*, the decision concluded "that the Nevada Supreme Court's determination that Malone's *Faretta* waiver was equivocal was . . . based on an unreasonable determination of the facts." Judge Rawlinson concurred in the result without further comment.

Judge Owens dissented. He first emphasized that "every case the majority relies on for its conclusion, except one, was decided either under the pre-AEDPA standard or outside the habeas context entirely," and that "[t]he sole AEDPA case the majority relies on is distinguishable." He then pointed to Malone's several equivocal statements, noting that "the AEDPA standard is not whether we think the request was unequivocal but whether the state court's decision to the contrary was unreasonable." He concluded, "I cannot say that the support in the record is so vast that the state court's decision was unreasonable."

## II

Federal habeas relief is an extraordinary remedy reserved for extraordinary circumstances. *See Shinn v. Martinez Ramirez*, 596 U.S. 366, 377 (2022) ("The writ of habeas corpus is an 'extraordinary remedy' that guards only against 'extreme malfunctions in the state criminal justice systems.'" (quoting *Harrington*, 567 U.S. at 102)). For claims adjudicated on the merits in state court, the writ may not issue unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

The panel majority erred in what should have been a routine application of well-settled habeas rules. In Part II.A, I recount how the panel ignored § 2254(d)(1)'s requirement that clearly established federal law be "determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). Clearly established Supreme Court precedent—including *Brewer*'s strong presumption that any ambiguity be construed in favor of appointed counsel—foreclosed relief, so the panel instead relied on Ninth Circuit precedent developed on direct appeal to reach its desired outcome. That was error. In Part II.B, I describe how the panel failed to respect § 2254(d)(2)'s requirement that federal courts sitting in habeas must defer to the factual findings made by the state court. *Id.* § 2254(d)(2). Although it paid lip service to that deference, the panel essentially undertook plenary review of the facts to reach a conclusion different from that of the Nevada Supreme Court.

A. *Section 2254(d)(1)*

For the writ to issue under 28 U.S.C. § 2254(d)(1), a state court's adjudication of the claim on the merits must have resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." AEDPA means what it says: Only Supreme Court opinions can clearly establish federal law for habeas purposes. *See Brown v. Davenport*, 596 U.S. 118, 136 (2022); *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (per curiam) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court[.]' It therefore cannot form the basis for habeas relief under

AEDPA." (citation omitted)). If any fairminded jurist could have reached the state court's conclusion in light of Supreme Court precedent, we are obligated to deny habeas relief. *See Brown*, 596 U.S. at 135.

The panel decision violates § 2254(d)(1)'s limitation on clearly established law. But this is no ordinary habeas error. Although proper application of AEDPA is usually at odds with the interests of criminal defendants, the panel's failure to apply AEDPA will undermine one of the most revered constitutional protections that we afford to people facing prosecution: the right to counsel in criminal proceedings.

The Supreme Court has declared as clearly as possible that courts must draw all reasonable inferences *against* waiver of the right to counsel. *See Brewer*, 430 U.S. at 404 ("[C]ourts [must] indulge in every reasonable presumption against waiver" of the right to counsel.); *see also*, *e.g.*, *McKaskle v. Wiggins*, 465 U.S. 168, 183–84 (1984); *Patterson v. Illinois*, 487 U.S. 285, 298 (1988); *id.* at 307 (Stevens, J., dissenting) ("It is well settled that there is a strong presumption against waiver of Sixth Amendment protections . . . ."). This presumption reflects the hallowed place the right to counsel occupies in our legal system and the jealousy with which we guard it. *See Gideon v. Wainwright*, 372 U.S. 335, 344 (1963); *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

The right to self-representation, by contrast, "occupies no hallowed status similar to the right to counsel enshrined in the Sixth Amendment." *Sandoval v. Calderon*, 241 F.3d 765, 774 (9th Cir. 2000). Because it "entails a concomitant forfeiture of the important benefits offered by the right to counsel," *id.*, we often dissuade criminal defendants from exercising the right to self-representation, *see Faretta*, 422

U.S. at 835, unlike with respect to other rights. *Faretta* therefore requires that a request for self-representation be unequivocal. *See id.* The unequivocality requirement "acts as a backstop for the defendant's right to counsel, by ensuring that the defendant does not inadvertently waive that right through occasional musings on the benefits of self-representation." *Adams*, 875 F.2d at 1444. The requirement also serves a finality-promoting purpose in the context of collateral review; it forestalls duplicitous strategic behavior by habeas petitioners. As we have explained:

> A defendant who vacillates at trial between wishing to be represented by counsel and wishing to represent himself could place the trial court in a difficult position: If the court appoints counsel, the defendant could, on appeal, rely on his intermittent requests for self-representation in arguing that he had been denied the right to represent himself; if the court permits self-representation, the defendant could claim he had been denied the right to counsel.

*Id.* *Brewer*'s presumption and the unequivocal-invocation rule operate in tandem: Absent an unequivocal request for self-representation, an indigent defendant is presumed to have requested the appointment of counsel. *See Clark v. Broomfield*, 83 F.4th 1141, 1150 (9th Cir. 2023) ("If [a defendant] equivocates, he is presumed to have requested the assistance of counsel." (alteration in original) (citation omitted)).

The Nevada Supreme Court faithfully applied these principles. It rightly noted that courts must "favor

representation by counsel as opposed to self-representation when a defendant's actions and statements are ambiguous." *Malone*, 2013 WL 7155086, at *2. It also correctly surmised that "a different waiver analysis applies to the right to self-representation than to the right to counsel," emphasizing that "to invoke the right to self-representation, a defendant must . . . waive his right to counsel in a clear and unequivocal manner." *Id.*

It was the federal district court—not the Nevada Supreme Court—that first misapplied clearly established federal law. The district court cited *Faretta* for the general proposition that "[a] defendant has a right under the Sixth and Fourteenth Amendments to represent himself at trial." It did not acknowledge *Brewer* or its strong presumption, nor did the court identify anything in the Nevada Supreme Court's opinion that is irreconcilable with *Faretta*. Instead, it relied on one pre-AEDPA and three direct-appeal Ninth Circuit cases to define the unequivocality requirement at a level of specificity not articulated by *Faretta*.

The panel doubled down on the district court's disregard of AEDPA. Its errors abound. First, it cited *Faretta* once, and only for the most general maxim that a defendant may defend himself if he truly wants to do so. But we have been warned against reading too much into such sweeping tenets: "[H]oldings that speak only at a high level of generality" "cannot supply a ground for relief." *Brown*, 596 U.S. at 136 (citations omitted); *see also Harrington*, 562 U.S. at 101 ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." (citation omitted)); *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("In turn, the state courts' greater leeway in reasonably applying a general rule translates to a narrower

range of decisions that are objectively unreasonable under AEDPA.").

Second, in relying on this abstract proposition from *Faretta*, the panel majority elided entirely *Brewer*'s clear establishment of a strong presumption in favor of appointed counsel.[1]  Without realizing it, the majority turned the *Brewer* presumption on its head by misapplying a direct-appeal case from our circuit (one that postdates the Nevada Supreme Court's decision by six years).  Citing *United States v. Audette*, 923 F.3d 1227, 1234–35 (9th Cir. 2019), the panel opined that "[p]eriodic vacillations . . . will not 'taint' later unequivocal waivers of counsel."  *Audette* stands for the unremarkable proposition that a defendant's prior equivocal statements will not foreclose the defendant from successfully invoking *Faretta* at a later time, if he does so unequivocally.  But the panel reversed *Audette*'s logic.  It used *Audette* to disregard Malone's equivocal statements made *after* his invocation of his *Faretta* rights—not before.  Regardless, the panel had no business relying on *Audette* for a more specific refinement of rules that *Faretta* itself does not clearly establish.  *See Lopez v. Smith*, 574 U.S. 1, 7 (2014) (per curiam) ("Circuit precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." (citation and quotation marks omitted)).

---

[1] The State plainly invoked this presumption, even though it did not cite *Brewer* by name.  *Compare* Opening Br. at 40 ("If he equivocates, he is presumed to have requested the assistance of counsel."  (citing *Adams*, 875 F.2d at 1444)), *with Adams*, 875 F.2d at 1444 ("[C]ourts must indulge in every reasonable presumption against waiver of the right to counsel[.]"  (citing *Brewer*, 430 U.S. at 404)).

The panel only compounded its errors from there. It cited *United States v. Mendez-Sanchez*, 563 F.3d 935 (9th Cir. 2009), for the principle that "even a conditional waiver of counsel can be unequivocal." And it cited *United States v. Robinson*, 913 F.2d 712 (9th Cir. 1990), for the principle that "expressions of [a defendant's] feeling 'forced' to [proceed *pro se*] do[] not render those statements equivocal." But *Faretta* does not clearly establish either one of these rules, and the panel majority's decision to the contrary is inconsistent with *Brewer*. We have again flouted AEDPA's conspicuous command that *only* Supreme Court precedent constitutes "clearly established Federal law." 28 U.S.C. § 2254(d)(1).

The decision's obvious legal failures are not cured by the panel majority's nominal reliance on § 2254(d)(2) instead of § 2254(d)(1). *Contra* Pregerson Statement at 31–32. Section 2254(d)(2) covers the unreasonable determination of historical facts, such as whether a defendant made a particular statement. But "[t]he effect of admitted facts"— such as whether a particular statement is equivocal—"is a question of law." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 227 (2020) (quoting *Nelson v. Montgomery Ward & Co.*, 312 U.S. 373, 376 (1941)). "Most constitutional questions that arise in habeas corpus proceedings," *Faretta* invocation among them, "require the federal judge to apply a rule of law to a set of facts." *Williams v. Taylor*, 529 U.S. 362, 384 (2000). These legal standards "often develop incrementally as earlier decisions are applied to new factual situations," but that "hardly" makes them any "less lawlike than those that establish a bright-line test." *Id.* at 384–85.

Although the panel majority "claimed its disagreement with the state court was factual in nature, in reality its grant of relief was based on a legal conclusion." *Lopez*, 574 U.S.

at 8 (summarily reversing the Ninth Circuit). The panel had to identify the legal standards governing equivocation before applying those standards to the facts. The panel majority's reliance on legal rules—and not historical facts alone—is unsurprising. After all, "absent a decision of [the Supreme Court] clearly establishing the relevant standard," the panel had "nothing against which it could assess" the validity of the state court's factual judgment. *Id.* at 9. The panel could not have reached its § 2254(d)(2) conclusion without relying on legal rules found only in our direct appeal decisions and not in *Faretta*.[2]

---

[2] Nor was this argument forfeited. The State argued that the district court improperly relied on pre-AEDPA cases to articulate the legal standard governing review of the facts. *See* Opening Br. at 2 ("[T]he court relied on a single pre-AEDPA opinion . . . ."); *id.* at 31 (arguing that it was error for the federal district court to "rel[y] on Ninth Circuit precedent to dictate its review of factual determinations by the Nevada Supreme Court"); *id.* ("[T]he federal district court erred by concluding that the reasoning in the pre-AEDPA decision in *Adams* was 'controlling.'"); Reply Br. at 7 ("The federal district court inappropriately analyzed the state court's factual determination in light of the pre-AEDPA decision in *Adams* . . . ."). The State also clearly preserved its § 2254(d)(1) argument for subsequent review. *See* Opening Br. at 41 n.3 ("To the extent that the Nevada Supreme Court's decision on equivocation is a question of law, it is not contrary to and did not involve an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.").

In its panel-stage briefing, the State argued that "the ultimate question about whether a request for self-representation is unequivocal or equivocal appears to be more akin to a 'legal question' than a factual one," but it acknowledged that some of our decisions on *Faretta* have proceeded under § 2254(d)(2). *Id.* After briefing and argument but before the panel filed its disposition, we published our opinion in *Clark v. Broomfield*, which reviewed a question of *Faretta* equivocation under § 2254(d)(1). *See* 83 F.4th 1141, 1150 (9th Cir. 2023) ("The California Supreme Court's decision holding that Clark's pre-trial *Faretta*

There is a particular danger embedded in the panel's decision, and our decision to decline rehearing en banc should not be misread as an expression of confidence in the panel's decision. Instead, that failure reflects a quixotic assessment that litigants and courts will readily observe that the panel's unpublished decision is so far afield of clearly established law that it cannot possibly be read to cast doubt on our precedential AEDPA decisions. If the panel decision finds its way into state courts, trial judges will have little guidance about the status of the *Brewer* presumption. And if state courts follow the panel's misadventure, we will be unable to correct those failures on appeal; we will see those decisions only on a collateral posture, where our review will be constrained by AEDPA.

State and district courts must be mindful that—unlike the nonprecedential panel decision—our published AEDPA cases on *Faretta* do faithfully apply clearly established law, including the *Brewer* presumption. *See Clark*, 83 F.4th at 1150 (reiterating that equivocal statements must be construed in favor of appointing counsel). Our decision in *Stenson v. Lambert*, 504 F.3d 873 (9th Cir. 2007), provides a remarkably relevant illustration of the proper application of the unequivocal-invocation requirement. Stenson's trial counsel wanted to concede the issue of guilt "in order to persuade the jury not to impose the death penalty." *Id.* at 877. Stenson vigorously disagreed, so he "moved for the

---

request . . . was equivocal was not contrary to, or an unreasonable application of, clearly established federal law . . . ."). Given the post-briefing clarity of the appropriate AEDPA standard, the State properly argued in its petition for rehearing that "[t]he panel's decision also conflicts with other Ninth Circuit precedent because the question of waiver of the right to counsel is a mixed question of law and fact." Pet. for Reh'g En Banc at 10.

appointment of new counsel or, in the alternative, to represent himself, pursuant to *Faretta*." *Id.* The trial court found his *Faretta* request equivocal, primarily because Stenson "made his request to represent himself only as an alternative, should the trial court refuse to appoint new counsel." *Id.* at 879. On collateral review, we affirmed the Washington Supreme Court's conclusion that Stenson's *Faretta* invocation was equivocal. We emphasized that the record "included several statements by Stenson that he really did not want to represent himself but that he felt the court and his existing counsel were forcing him to do so." *Id.* at 883. Even though Stenson unambiguously did not want to proceed with his current counsel, his request for self-representation was equivocal. *See id.* *Stenson* belies the panel majority's assertion that a defendant's statements of "feeling 'forced' [to proceed *pro se*] do[] not render those statements equivocal." *Stenson* makes clear that a conditional invocation—one in which the defendant declares that he does not want to be represented by his current counsel—is not unequivocal if he would potentially be open to other appointed attorneys.

Our published decisions notwithstanding, there is reason to believe that the unpublished disposition here will find its way into state and district courts. Other courts reading our cases police the boundary between precedential and nonprecedential decisions less carefully than we might like. Many of our unpublished habeas decisions are cited in state and district courts. *See*, *e.g.*, *Mason v. Kibler*, No. 20-CV-02186, 2021 WL 663666, at *10 (E.D. Cal. Feb. 19, 2021) (citing *Greel v. Martel*, 472 F. App'x 503 (9th Cir. 2012)); *Guzman v. Spearman*, No. 16-CV-2659, 2018 WL 6243314, at *7 (S.D. Cal. Nov. 29, 2018) (first citing *Grajeda v. Scribner*, 541 F. App'x 776 (9th Cir. 2013); and then citing

*Hollie v. Hedgpeth*, 456 F. App'x 685, 685 (9th Cir. 2011));
*Doyle v. State*, 131 Nev. 1273, 2015 WL 5604472, at *2 n.5
(Nev. Sept. 22, 2015) (unpublished) (citing *Williams v.
Haviland*, 394 F. App'x 397 (9th Cir. 2010), to decide
whether the state court's "prior decision on direct appeal was
contrary to clearly established and controlling federal law");
*State v. Phan*, 522 P.3d 105, 112 (Wash. Ct. App. 2022)
(citing *Becker v. Martel*, 472 F. App'x 823 (9th Cir. 2012));
*People v. Lapenias*, 67 Cal. App. 5th 162, 174 (Cal. App. 3d
2021) (citing *Amaya v. Frauenheim*, 823 F. App'x 503 (9th
Cir. 2020)); *see also* Scott Rempell, *Unpublished Decisions
and Precedent Shaping:  A Case Study of Asylum Claims*, 31
Geo. Immigr. L.J. 1, 44 (2016) ("Unpublished dispositions
are ostensibly more palatable because, if nothing else, they
purportedly apply well-delineated and settled law.").  That is
especially true in pretrial criminal proceedings, where
arguments and decisions are often given orally rather than in
writing.

We should have nipped this case in the bud.  Criminal
defendants deserve the benefit of the *Brewer* presumption,
and states deserve the benefit of AEDPA's deferential
standard of review.  The panel decision in this case benefits
no one but Malone.

B. *Section 2254(d)(2)*

The panel decision fares no better under § 2254(d)(2),
even assuming that *Faretta* equivocation is a pure question
of historical fact.  For the writ to issue under § 2254(d)(2),
the state court's decision must have been based "on an
unreasonable determination of the facts."    28 U.S.C.
§ 2254(d)(2).    This, too, is an especially demanding
standard.  Section 2254(d)(2) "requires that we accord the
state trial court substantial deference.  If reasonable minds

reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (cleaned up) (citation omitted). Instead, "we may only hold that a state court's decision was based on an unreasonable determination of the facts if 'we [are] convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.'" *Pizzuto v. Yordy*, 947 F.3d 510, 523 (9th Cir. 2019) (per curiam) (alteration in original) (citation omitted).

The panel transformed collateral review under AEDPA into an exercise of ordinary appellate review. *Contra Shinn*, 596 U.S. at 377 ("[F]ederal habeas review cannot serve as 'a substitute for ordinary error correction through appeal.'" (quoting *Harrington*, 562 U.S. at 102–03)). When we consider an AEDPA challenge under § 2254(d)(2), we must "accord the state trial court substantial deference." *Brumfield*, 576 U.S. at 314. The panel did not apply that deference. It made its own judgments about what the record said: "Having reviewed the entire record, we agree with the district court that Malone was not equivocal about his desire to represent himself . . . . Malone never wavered from that position after he was granted leave to represent himself."

The panel's factual finding that Malone's *Faretta* request was unequivocal is just wrong under any standard of review—and egregiously so under AEDPA. I point out a few, inexhaustive examples. At one hearing, the trial court asked Malone, "You want a lawyer?" Malone replied, "I did. Not the ones I got now." At another hearing, Malone stated, "I had asked for . . . counsel and stuff like that . . . . [Y]ou denied me the right to have representation." And Malone ultimately wrote to the state court, declaring that he had

"been forced to represent himself in this case" and that he "ha[d] always been more than willing to accept proper assistance," but he accused the court of "not allow[ing] him to pursue this goal." The state court asked Malone about this memorandum: "Sir, your pleading[] [is] very clear. The Defendant did not want to represent himself in this matter." Malone's reply was unambiguous: "Yes. Yes, sir."

The Nevada Supreme Court canvassed these facts with specificity. *See Malone*, 2013 WL 7155086, at \*1–2. It concluded that "[t]he district court's finding that Malone's actions were equivocal . . . was not clear error." *Id.* at \*2. Because the Nevada Supreme Court, applying clear error review, did not commit objectively unreasonable factual errors in finding Malone's statements equivocal, the panel had no business substituting its own judgment for that of the state court.

## III

The panel decision's deficiencies are all the more troubling because there was an independent basis to deny relief—one that *Faretta* clearly establishes:

> [T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct . . . . The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law.

*Faretta*, 422 U.S. at 834 n.46. That basis was invoked by the Nevada Supreme Court, citing *Faretta* and footnote 46.

*See Malone*, 2013 WL 7155086, at \*2.  The State argued it to the panel.  *See* Opening Br. at 13–14, 29–30, 45.  The panel ignored it entirely, offering no explanation to the State for rejecting an independent basis for the Nevada Supreme Court's decision.

"*Faretta* itself and later cases have made clear that the right to self-representation is not absolute[.]"  *Indiana v. Edwards*, 554 U.S. 164, 171 (2008) (citing *Faretta*, 422 U.S. at 834 n.46).  "*Faretta* . . . made it clear that a constitutional 'right of self-representation is not a license to abuse the dignity of the courtroom,' and therefore, 'the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.'"  *Clark*, 83 F.4th at 1150 (quoting *Faretta*, 422 U.S. at 834 n.46).  We have held that *Faretta* clearly establishes that a court may revoke self-representation if invocation is made for abuse or delay.  *See*, *e.g.*, *Stenson*, 504 F.3d at 882; *United States v. Mack*, 362 F.3d 597, 601 (9th Cir. 2004) ("That does not mean that the defendant's right to self-representation overcomes the court's right to maintain order in the courtroom and conduct proceedings in a manner consonant with our trial traditions.").

Malone repeatedly flouted court rules, filed frivolous motions, and engaged in tactics designed to delay and obstruct the proceedings, as I described in Part I.A.2.  Because these instances are voluminous, I do not repeat them here.  The trial court admonished Malone for these issues and correctly informed him that it could revoke self-representation on that basis.  Expressly relying on footnote 46 of *Faretta*, the Nevada Supreme Court affirmed Malone's conviction in part because the trial court did not clearly err in determining that Malone's self-representation

"appeared to be made for the purposes of delay." *Malone*, 2013 WL 7155086, at *2.

In granting the writ, the district court concluded that "[t]he record does not support a finding of a pattern of substantial procedural obfuscation or delay by Malone." That finding is indefensible. The record displays an unmistakable pattern of disruption and delay spanning years. *See* Part I.A.2, *supra*. The district court's conclusion is all the more puzzling in light of AEDPA's command that federal courts defer to factual determinations made by the state courts. The State pointed out the district court's failure to the panel on appeal, but the panel penned not a single word on this point. Because this was an independent basis on which the state courts denied relief, the panel was duty-bound to address it before affirming the district court. *See Wetzel v. Lambert*, 565 U.S. 520, 525 (2012) (per curiam) ("Any retrial here would take place . . . *decades* after the crime, posing the most daunting difficulties for the prosecution. That burden should not be imposed unless *each* ground supporting the state court decision is examined and found to be unreasonable under AEDPA.").

Instead, the panel majority addresses the issue for the first time in its statement respecting the denial of rehearing en banc. The statement's primary response—that "the trial court never revoked Malone's self-represented status on that basis," Pregerson Statement at 37—is wrong on both law and fact.

Start with the law. First, the panel majority's statement ignores well-established appellate practice. Courts of appeals, including the Nevada Supreme Court, "have discretion to affirm on any ground supported by the law and the record." *Upper Skagit Indian Tribe v. Lundgren*, 584

U.S. 554, 560 (2018); *United States v. Marin*, 90 F.4th 1235, 1240 (9th Cir. 2024) ("[W]e may affirm on any basis, 'whether or not relied upon by the district court.'" (citation omitted)); *In re Guardianship of Jones*, 531 P.3d 1236, 1248 (Nev. 2023) ("The district court's decision may be affirmed on any ground supported by the record, even if not relied upon by the district court."). Second, the statement focuses on the wrong court. It concentrates primarily on what the state trial court said, not what the Nevada Supreme Court did. *See* Pregerson Statement at 37–39. That is simply wrong. "When more than one state court has adjudicated a claim, we analyze the last reasoned decision," not the first. *Rishor v. Ferguson*, 822 F.3d 482, 489 (9th Cir. 2016) (citation omitted); *see Davenport*, 596 U.S. at 141 ("Under the statute's terms, we assess the reasonableness of the 'last state-court adjudication on the merits of' the petitioner's claim." (citation omitted)). "In doing so, the federal court should review the last decision in isolation and not in combination with decisions by other state courts." *Curiel v. Miller*, 830 F.3d 864, 870 (9th Cir. 2016) (en banc) (citation and quotation marks omitted). This rule flows from the text of AEDPA itself; "the phrase 'resulted in a decision' in the 'unless' clause obviously refers to the decision produced *by that same adjudication on the merits*," not some earlier adjudication by an inferior court. *Greene v. Fisher*, 565 U.S. 34, 40 (2011). Third, the statement faults the state courts because the *trial* court did not *say* it was relying on footnote 46 of *Faretta* in its colloquy revoking Malone's self-representation. *See* Pregerson Statement at 37–39. There is no such obligation clearly established in *Faretta* or any other case. The panel has invented new law. Because the Nevada Supreme Court could affirm on any basis supported by the record, and because the record amply

supports the state supreme court's reliance on footnote 46 of *Faretta*, the panel was obligated to address the issue and should have denied the writ.

Now consider the facts. The panel majority's statement reads the facts selectively, without the deference the Nevada Supreme Court is owed under § 2254(d)(2). In several hearings leading up to the revocation, the state court made factual findings about Malone's disruption and delay. Several months after Malone successfully invoked his *Faretta* rights, the judge warned Malone: "I have grounds to . . . revoke your status of representing yourself because I have a basis to do that if you're disruptive to the Court, you don't file a proper Court procedure [*sic*]. . . . So if you do that again, Mr. Cano or Mr. Pike will be representing you." At a later hearing, the judge again admonished Malone: "I advised you last time that if you . . . did not follow the rules as you're supposed to[,] that could be grounds for me to no longer allow you to represent yourself." Malone's handwritten memo to the court, requesting counsel, was just another instance of these obfuscatory tactics. It was the straw that broke the camel's back. It strains credulity to think that the state court did not view these vacillations as part of Malone's broader pattern of delay and disruption. At a hearing after the judge had revoked Malone's *Faretta* rights, the trial court reflected that Malone had been "playing games" since the initial *Faretta* canvass. It was entirely reasonable for the Nevada Supreme Court to conclude that the trial court revoked Malone's *Faretta* rights for several reasons, including his pattern of delay and disruption.

In light of the foregoing, the panel is left to claim that the Nevada Supreme Court did not mean what it said when it wrote that Malone "repeatedly failed to follow procedural rules" and that his invocation "appeared to be made for the

purposes of delay." *Malone*, 2013 WL 7155086, at \*1, \*2. The statement faults the Nevada Supreme Court for addressing Malone's obstruction "briefly" and in only "passing mention." Pregerson Statement at 40. It further blames the state court for failing to include in its opinion a summary of "the specific obstructionist instances" of Malone's misconduct. *Id.* (The statement conspicuously fails to mention that the Nevada Supreme Court cited *Faretta* footnote 46 and its progeny in correctly stating that a self-represented defendant may forfeit his *Faretta* rights "through his actions." *Malone*, 2013 WL 7155086, at \*2 (first citing *McKaskle*, 465 U.S. at 183; then citing *Faretta*, 422 U.S. at 834 n.46)).

The panel has once again created a legal rule out of whole cloth—namely, that a state court opinion must discuss a ground for denying relief more than just "briefly" or in "passing." The panel's approach is diametrically opposed to Supreme Court precedent. On collateral review, "[f]ederal courts have no authority . . . to impose . . . opinion-writing standards on state courts." *Johnson v. Lee*, 578 U.S. 605, 611 (2016) (per curiam) (citation omitted); *cf.*, *e.g.*, *Harrington*, 562 U.S. at 98 ("[D]etermining whether a state court's decision resulted from an unreasonable . . . factual determination does not require that there be an opinion from the state court explaining the state court's reasoning."). A state may show that the state court "did rely on [certain] grounds" for denying relief by pointing to "grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018). The State briefed Malone's obstruction to the Nevada Supreme Court. *See* Brief for Respondent at 30, *Malone*, 2013 WL 7155086 ("Appellant's disruptive, obstructive, and dilatory conduct as a pro se

defendant constituted grounds to revoke his *Faretta* waiver.'"
(heading capitalization omitted)); *see also id.* at 30–32
(cataloguing record citations); *id.* at 31 (citing, *inter alia*,
*Faretta*, 422 U.S. at 835 n.46). And the panel all but
concedes that Malone's disruption is obvious from the
record. *See* Pregerson Statement at 39–40. It is obvious
error for the panel to shrug off a ground for relief that the
state court expressly mentioned simply because the court's
explanation was brief. The panel majority's statement fails
to apply the "highly deferential standard for evaluating state-
court rulings," which "demands that the state-court decisions
be given the benefit of the doubt." *Renico v. Lett*, 559 U.S.
766, 773 (2010) (citations omitted).

## IV

We should have reheard this case en banc. It was the
panel majority—not the state courts—that violated clearly
established federal law, as determined by the Supreme Court.
Had the state trial court *not* re-appointed the public
defender's office, Malone would have had a formidable
claim to habeas relief based on a violation of his right to
counsel and the presumption against self-representation
recognized in *Brewer*. The panel majority has allowed
Malone to "tak[e] advantage of the mutual exclusivity of the
rights to counsel and self-representation" by "rely[ing] on
his intermittent requests for self-representation in arguing
that he had been denied the right to counsel." *Adams*, 875
F.2d at 1444. In so doing, the panel has violated AEDPA
through and through.

I respectfully disagree with our decision not to rehear
this case en banc.

PREGERSON, District Judge (sitting by designation), with whom Judge Rawlinson joins, respecting the denial of rehearing en banc:

The statement respecting the denial of rehearing en banc ("the Statement") ignores our own precedent, requests summary reversal on grounds never raised by the parties, inaccurately characterizes both the memorandum disposition and the record upon which it is based, and seeks to substitute its own factual determinations for that of the panel majority. The court is right not to hear this case en banc.

## I.

In contrast to the Statement's extensive discussion of and reliance upon 28 U.S.C. § 2254(d)(1), Appellant's opening brief made but a single, footnoted reference to Section (d)(1), acknowledging that "this Circuit, along with the majority of neighboring circuits, appears to have consistently treated [equivocation] as a question of fact governed by §§ 2254(d)(2) and (e)(1) and not § 2254(d)(1)." Appellant cited to our decision in *Stenson v. Lambert*, where we (1) treated a question as to the equivocality of a *Faretta* waiver as a question of fact; (2) applied Section 2254(d)(2) to that factual question; (3) recognized that "[a] clear preference for receiving new counsel over representing oneself does not conclusively render a request equivocal under *Faretta*;" and (4) concluded, "in light of the record as a whole," that the state court's determination of equivocation was not unreasonable. *Stenson*, 504 F.3d 873, 882-884 (9th Cir. 2007), cert. denied, *Stenson v. Uttecht*, 555 U.S. 908 (2008)); *see also Batchelor v. Cain*, 682 F.3d 400, 407 (5th Cir. 2012) (analyzing equivocation, post-AEDPA, as question of fact under Section (d)(2)). In accordance with *Stenson*, the district court here decided this case under

Section (d)(2), Appellant argued the appeal under Section (d)(2), and the memorandum disposition analyzed the case under Section (d)(2).  Thus, the only question addressed here by the panel majority and dissent alike was whether the Nevada Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[1]   28. U.S.C. § 2254(d)(2); *see also Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived.")

---

[1]  Having decided this case pursuant to Section (d)(2), the memorandum disposition did not have any occasion, let alone purport, to define the parameters of "clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1). Moreover, the disposition's references to pre-AEDPA and direct-appeal cases did not, and of course could not possibly, bootstrap circuit precedent up to the level of clearly established Supreme Court authority or otherwise establish any novel legal principles.  *Id.*; *see also* Ninth Circuit Rule 36-3(a) ("Unpublished dispositions and orders of this Court are not precedent . . . .").  Neither did our numerous similar references in other equivocation cases.  *See, e.g.*, *Stenson*, 504 F.3d at 883-884 (discussing *Adams v. Carroll*, 875 F.2d 1441 (9th Cir. 1989), *United States v. Kienenberger*, 13 F.3d 1354 (9th Cir. 1994), and *United States v. Hernandez*, 203 F.3d 614 (9th Cir. 2000); *Clark v. Broomfield*, 83 F.4th 1141, 1150 (9th Cir. 2023) (citing, among others, *Walker v. Loggins*, 608 F.2d 731, 734 (9th Cir. 1979), *Adams*, 875 F.2d at 1444, *Jackson v. Ylst*, 921 F.2d 882, 888–89 (9th Cir. 1990), *Kienenberger*, 13 F.3d at 1356, and *Hernandez*, 203 F.3d at 622 n.11).  Indeed, far from conflating AEDPA cases with other cases, the disposition explicitly acknowledged that "we have rarely addressed the equivocality of a *Faretta* waiver in the AEDPA context" before discussing AEDPA cases in which we have done so.

## II.

In answering the question whether the state court's decision was based upon an unreasonable determination of the facts, both the panel majority and the dissent looked to two of this Court's equivocation decisions: *Stenson* and *Tamplin v. Muniz*, 894 F.3d 1076 (9th Cir. 2018).[2]  Although we need not duplicate the discussions of which case is more analogous to the instant matter, it bears notice that while the Statement finds *Stenson* "remarkably relevant," it does not so much as mention *Tamplin*, where we concluded on AEDPA review that, contrary to the state court's determination, a defendant had unequivocally invoked his right to represent himself.  Statement at 20.  In *Tamplin*, the defendant invoked his *Faretta* right to self-representation after his retained counsel was suspended from the practice of law.  *Tamplin*, 894 F.3d at 1084.  At a second hearing about a week later, the defendant maintained that he wished to proceed pro se, including by stating, "I'm going to represent myself," "I have a right to go pro per at this time. I'm trying to go back to pro per," and, "I told you I don't want no public defender, none of the ones that you are going to

---

[2]  A recent third decision, *Clark v. Broomfield*, 83 F.4th at 1150 (9th Cir. 2023) is so factually distinguishable as to be of little assistance.  There, the defendant, in a single emotional outburst, said, "I'm thoroughly capable of handling this case," thereby apparently seeking to dismiss only one of his two lawyers.  *Clark*, 83 F.4th at 1151.  Accordingly, we took no issue with a state court determination that the defendant "did not unequivocally assert his right to self-representation."  *Id.*

Although the Statement suggests that *Clark*, notwithstanding its numerous favorable citations to *Stenson*, somehow provided "clarity" that, contrary to *Stenson*, questions of *Faretta* equivocation should be reviewed under § 2254(d)(1) rather than (d)(2), the three-judge panel opinion in *Clark* says no such thing.  Statement at 19-20 n.2.  *Stenson* remains the law of this circuit.

appoint." *Id.* During that same second hearing, in response to a question from the court as to whether he wanted to hire another attorney, Tamplin responded that he would be able to do so if the court ordered the first, suspended attorney to return Tamplin's money. *Id.* at 1081. Notwithstanding that statement, and contrary to the state court's determination that Tamplin equivocated, this Court observed that the colloquy at the second hearing "reads like an exercise in how many ways a defendant can say that he wants to represent himself," and remanded with instructions to the district court to grant a writ of habeas corpus. *Id.* at 1084, 1091.

Here, as the majority disposition observed, Malone's efforts "far outstripped those of the defendant in *Tamplin*." The panel majority reached that conclusion after reviewing the entire record, as it was required to do.**[3]** *See Burt v. Titlow*, 571 U.S. 12, 22 (2013); *Wiggins v. Smith*, 539 U.S. 510, 512 (2003); *Clark*, 83 F.4th at 1154; *Stenson,* 504 F.3d at 883. The Statement does not acknowledge, let alone hew to, this fundamental principle, opting instead to selectively quote certain portions of the record out of context while eliding others. For example, the Statement reproduces Malone's statement that he "did would [sic] like to have my counsel back" to suggest that Malone actually asked for counsel back. Statement at 6. Malone did not, however, make that statement in a vacuum. Rather, he was responding to a sardonic comment by the trial judge that "It probably would have been a good idea to have an attorney, wouldn't it?" As Malone tried to explain, he might have wanted counsel back at some point in the past, had counsel not continued to seek trial delays to which Malone was vocally

---

[3] The excerpts of record here span nearly five thousand pages across 23 volumes and more than five years of trial court proceedings.

and consistently opposed.[4]  Similarly, although Malone's "at this point in time" comment might, by itself, suggest equivocation or some possibility that Malone would ask for counsel in the future, Malone did not make the statement in isolation. Statement at 6-7.  As described above, in context, Malone was explaining that although he might have wanted counsel back under other circumstances in the past, that ship had sailed.

The Statement's blinkered view of the facts also ignores Malone's multiple, strident reassertions, made over the course of more than a year, of his continuing desire to represent himself.  For example, Malone affirmed to the trial court that he was, in the court's words, "hellbent" on representing himself, responded, "[S]ir, yes sir" when directly asked approximately three months later whether he still wanted to represent himself, and wrote approximately eleven months later that he was "more than ready and willing to fight to the point of death for the rights giving on to him [sic] by his beloved country."

Rather than consider the record as a whole, the Statement instead jumps to the conclusion that only by ignoring well-

---

[4]  It is undisputed that here, apart from a limited inquiry in open court into certain discovery disputes, the trial court never held any sealed, let alone in camera, proceeding to determine the extent or genuineness of Malone's conflict with counsel.  This apparently was par for the course. At oral argument, all counsel concurred that it is standard operating procedure in Nevada state criminal proceedings to evaluate potential issues with criminal defense counsel in open court, in the presence not only of the prosecution, but also members of the public, defendants in other cases, and potentially even co-defendants.  Questions regarding the Sixth Amendment implications of this practice are, however, beyond the scope of the issues here.  *See*, *e.g.*, *Michaels v. Davis*, 51 F.4th 904, 938 (9th Cir. 2022), cert. denied, 144 S. Ct. 914 (2024).

settled legal standards could the panel majority possibly disagree with the Statement's alternative, selective reading of the record. It has long been established that we may not grant relief under Section (d)(2) unless we determine that "the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014)). The Statement asserts that, notwithstanding the memorandum disposition's numerous references to cases applying this uncontroversial principle, including, but not limited to, *Stenson* and *Tamplin*, the panel majority must not have afforded the state court the appropriate deference because the majority stated that it "reviewed the entire record." Statement at 23. As discussed above, the panel was *required* to review the entire record, and the Statement's suggestion to the contrary flies in the face of both our own and Supreme Court precedent. Having reviewed the record as a whole, the panel majority concluded that the state court's determination that Malone equivocated was not just wrong, it was unreasonably so.[5] That the Statement reads the record differently does not mean that the panel majority substituted its judgment for that of the state court or otherwise improperly granted relief where the state court was "merely wrong."

---

[5] *Brewer v. Williams*, not cited in either Appellant's opening brief or reply, makes no mention of *Faretta* or equivocation and, in any event, adds little to the analysis here, insofar as it would require "every reasonable presumption against waiver" in the context of a Section (d)(2) standard that already requires a petitioner to demonstrate an unreasonable determination of fact. *Brewer*, 430 U.S. 387, 404.

## III.

Lastly, neither the panel majority nor the dissent addressed the Statement's "serious and obstructionist conduct" argument because, quite simply, the trial court never revoked Malone's self-represented status on that basis and the Nevada Supreme Court never affirmed on that basis. Because the record speaks for itself, we reproduce the trial court's reasoning here:

> THE COURT: All right. The – as all parties know, we went through a *Faretta* Canvassing, a very thorough canvass in this matter.
>
> Mr. Malone has just advised the Court that he was forced to represent him in this case. I'm quoting from his pleading. It said, had not the Defendant been forced to represent him in this case, this matter would have been swept under the rug. Another section in his pleading he states the Defendant did not want to represent himself. So he has motion [sic] this Court for help only to be denied by this Court on numerous occasions which I think it says exhorted – exerted the forced situation. And so Mr. Malone has advised me that everything contained in this pleading is correct.
>
> Sir, if you feel you have been forced to represent yourself and there's – and that you did not want to represent yourself, your request to represent yourself is now vacated or is denied. Also, the Court looks at the –

the various cases that state that when a case is overly complex, this Court can also deny someone his right to represent himself; that's Lyons v. State.

And for Defendant's request or Defendant advising the Court that he was forced and he did not want to represent himself, therefore, his status no longer exists. The Special Public Defender's Office is ordered to represent him no longer as stand-by counsel.

* * *

THE DEFENDANT:  Sir, the memorandum that I filed with this Court was saying that you was forcing the Special Public Defender's Office on me, Your Honor. That's what –

THE COURT: That's not what it said.

THE DEFENDANT: that's what I was saying when I said forced – the attorneys forced me to represent myself cause I'm only represented by the stand-by counsel which was created a issue at first; that's the reason why I had wrote the memorandum, sir.

THE COURT: Sir, your pleadings very clear. The Defendant did not want to represent himself in this matter.

THE DEFENDANT: Yes. Yes, sir.

THE COURT: Okay. Your wish is granted, sir.

THE DEFENDANT: Sir –

THE COURT: Mr. Pike and Mr. Cano will represent you. We're done.

As is evident from the colloquy above, the trial court's revocation of Malone's self-represented status was based solely on his supposed equivocation, and had nothing to do with his pretrial behavior.[6]   There were no findings concerning delay or obstruction, and no mention of Malone's frivolous motions, failure to follow court rules, contradictory statements, unpreparedness for trial, or other obstructionist tactics referenced in the Statement.

Accordingly, the Nevada Supreme Court grounded its decision on Malone's equivocation as well.  Although the Statement goes to great lengths to establish a "pattern of disruption and delay," Statement at 8, the Nevada Supreme Court's Order of Affirmance made no such finding, nor referenced any of the specific obstructionist instances described in the Statement.  Rather, in the course of describing Malone's equivocal behavior, the Nevada Supreme Court briefly observed that "Malone repeatedly failed to follow procedural rules," before proceeding to then list numerous examples of Malone's supposed equivocation

---

[6]  As the Statement observes, the trial court admonished Malone in January 2011, "[I]f you d[o] not follow the rules as you're supposed to that could be grounds for me to no longer allow you to represent yourself. You break the rules again, I'm going to determine that you cannot follow the rules and therefore you'll have these gentlemen who will represent you."  But notwithstanding subsequent "obstructionist tactics" described in the Statement, the trial court permitted Malone to continue representing himself for a further six months before revoking Malone's status in the colloquy reproduced above, with no mention whatsoever of Malone's pretrial conduct.

and describing those "actions and representations" as forming the basis for the trial court's revocation of Malone's self-represented status. The Nevada Supreme Court's legal conclusion reflects the same emphasis on Malone's vacillation:

> We conclude that the district court's decision to revoke Malone's right to self-representation was not an abuse of discretion. The district court's finding that Malone's actions were equivocal and appeared to be made for the purposes of delay was not clear error. Malone went back and forth several times when deciding whether he wanted to represent himself, and even accused the district court of forcing him into representing himself. Malone also stated in his memorandum that he wanted proper assistance of counsel. After further canvassing from the district court, Malone confirmed that he did not want to represent himself. Therefore, we conclude that the district court's decision to revoke Malone's right of self-representation was within its discretion.

The Nevada Supreme Court's passing mention of actions that "appeared to be made for the purposes of delay" was made in the context of Malone's communications to the state trial judge concerning his self-representation rights, not unrelated failures to follow procedural rules. Thus, contrary to the Statement's characterization, the Nevada Supreme Court did not invoke any deliberate, serious, and obstructionist misconduct as the basis for its affirmance of

the trial court's revocation of Malone's self-represented status.

Notwithstanding the Statement's assertion that it "strains credulity to think that the state court did not view [Malone's] vacillations as part of [a] broader pattern of delay and disruption," Statement at 28, the Statement provides no authority for its suggestion that a reviewing judge's belief about what state court judges' thought processes must have been can supplant what the state courts actually said. The Statement's post-hoc, alternative rationales for the trial court's revocation of Malone's self-represented status and the Nevada Supreme Court's subsequent affirmance do not justify en banc review of this case.

## IV.

The Statement attempts to force a square peg into a round hole, characterizing a memorandum disposition involving a factual conclusion as a paradigm-shifting declaration of new legal principles and usurpation of the Supreme Court's exclusive authority. The disposition is a non-precedential determination of fact on an issue that was presented solely as a question of fact. This Court appropriately declined to rehear this case en banc.